228 So.2d 382 (1969)
Cecil PERKINS, Appellant,
v.
STATE of Florida, Appellee.
No. 37005.
Supreme Court of Florida.
October 8, 1969.
Rehearing Denied November 24, 1969.
*384 S. Gunter Toney, of Toney & Guarisco, Tallahassee, for appellant.
Earl Faircloth, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., for appellee.
PER CURIAM.
This is a direct appeal from a verdict and judgment convicting Appellant of rape without recommendation of mercy. Jurisdiction of the appeal attached under Section 4(2), Article V, Florida Constitution, F.S.A.
Appellant, Cecil Perkins, a seventeen-year-old Negro, was indicted on October 9, 1967 for the rape of a nineteen-year-old white woman. The victim testified she lived in a trailer about five miles north of Havana, Florida, with her husband and her one-year-old child. On Monday, August 14, 1967, she took her husband to work in Tallahassee at 7:15 a.m., and returned with her child to her home at 8:30 or 8:45 a.m. She recalled that at approximately 9:30 a.m. a Negro man appeared at the door and called for her husband, "Johnny Boy," and said he wanted to use the telephone. Since a number of the people in the area referred to her husband by that name, the witness assumed her husband knew the man and that it would be all right to make the call for him. Then, after making the telephone call and receiving a recorded answer, she testified the man came through the door, saying that he was going to kill her. At this point in the trial, the witness pointed to Appellant as the person who came through the door at her. When the Appellant lunged at her, the witness recalled she dropped the telephone and ran backwards about thirty feet into the bathroom where she fell, striking her head on the tub. She stated Appellant then grabbed her by the neck and questioned her as to the presence of other persons in the house and as to the amount of money she had. During an ensuing scuffle, the witness testified her slacks were forcibly removed; that she was thrown on the bed; and that appellant "got on top of" her and had sexual intercourse with her.
The day after the assault, according to the victim's testimony, she identified Appellant from some photographs shown her by Sheriff Edwards and Deputy Martin of the Gadsden County Sheriff's Department. She testified that later in the week, she was taken to the jail in Bainbridge, Georgia, where she positively identified Appellant as the person who assaulted her. During the course of her testimony, the witness identified a pocketbook as her property. She displayed the pocketbook and its contents in the presence of the jury and stated that the pocketbook and its contents disappeared at the time of the assault.
Appellant was taken into custody around 11:00 a.m. on the day of the alleged crime when officers entered the house of Appellant's father located across the Georgia state line and found Appellant in one of the bedrooms. The arresting officers were led by Sheriff White of Decatur County, Georgia, who testified the officers were given permission to search the premises by Appellant's stepmother and wife. These persons testified that no such permission to search was given to the officers. Certain clothes and jewelry alleged to belong to the victim, and alleged to have been found in the room occupied by Appellant, were admitted into evidence over Appellant's motion to suppress. A pocketbook alleged by investigating officers to have been found by Appelant's twelve-year-old sister, as hereinafter more fully explained, was also admitted into evidence over Appellant's motion to suppress. *385 Investigating officers testified the whereabouts of the pocketbook was made known through Appellant's admission after he was placed in the Bainbridge jail, and that this information was given to Appellant's sister after a search of the designated area had failed to produce the pocketbook. Sheriff White and Deputy Martin testified that "Miranda warnings" were read to Appellant before he was questioned and before any incriminating statements were obtained, and that Appellant was not coerced or threatened in any way. Officer Martin testified as to statements made by Appellant which implicated him in the crime. Appellant testified he was held incommunicado without food until Wednesday evening, at which time he was handcuffed to some jail bars and beaten. At this time Appellant stated he told the authorities he would admit to whatever they said he did. Appellant further testified that at no time was he advised of his rights and that he was told he did not need a lawyer. The officers vigorously denied that Appellant was not warned of his rights and that his statements were not voluntarily given.
Trial commenced on January 23, 1968. The next day the jury returned a verdict of guilty of rape as charged in the indictment, without a recommendation of mercy. Motion for new trial was denied and on January 31, 1968, Appellant was sentenced to death. A notice of appeal was timely filed in the Circuit Court of the Second Judicial Circuit in and for Gadsden County, Florida, on February 1, 1968.
In his appeal to this Court, the following contentions raised by Appellant merit discussion:
(1) Whether the trial court erred in denying Appellant's motion to suppress tangible evidence found in the bedroom Appellant was occupying at the time of his arrest, and in admitting testimony concerning such evidence.
(2) Whether the trial court erred in denying Appellant's motion to suppress the pocketbook, State Exhibit No. 8, and in denying Appellant's motion for a mistrial which was grounded on the introduction of hearsay testimony in connection therewith.
(3) Whether the trial court erred in admitting into evidence testimony of the out-of-court identification of Appellant by the prosecutrix consisting of the photographic identification and the subsequent custodial identification where such out-of-court identifications took place in the absence of counsel for appellant; and whether the in-court identification of Appellant by the prosecutrix was tainted by the prior out-of-court identifications.
(4) Whether the trial court erred in admitting into evidence testimony as to the alleged admissions and confessions of Appellant.
(5) Whether the trial court excused for cause prospective jurors who merely voiced opposition to capital punishment or expressed conscientious scruples against same, thereby violating Appellant's constitutional right to an impartial jury.
We proceed to dispose of Appellant's contentions in the order stated above.
As to the issue the trial court erred in refusing to suppress certain evidence found in the bedroom Appellant was occupying at the time of his arrest, and in admitting testimony pertaining to such evidence, we do not understand Appellant to question the well-settled and oft stated rule that a warrantless search is permissible if properly incident to a lawful arrest. Rather, the thrust of Appellant's argument on this issue is grounded on the contention that the disputed evidence was secured as a product of a search incident to an arrest which was not bottomed on the existence of the necessary element of probable cause. Examination of the record does not sustain Appellant's contention on this point.
First, the investigating officers, consisting virtually of a team of Florida and Georgia officers headed officially by Sheriff White of Decatur County, Georgia, *386 knew that the victim was assaulted by a young Negro male. The officers were given a description of the assailant by the victim. The officers discovered a pick-up truck with Georgia license plates located in relative proximity of the victim's home. A license check of this vehicle precipitated an interrogation of the registered owner's wife which in turn revealed that Appellant, the owner's brother-in-law, had possession of the truck on the morning of the attack and was supposed to have used it for transportation to work that morning. The investigating officers also discovered the victim's car, which was stolen by the assailant, abandoned about a mile from the location of the residence of Appellant's father. Further investigation led to witnesses who related they had seen the "Perkins boy" walking from the direction of the victim's abandoned car, through a cornfield, emerging on the main road where he caught a ride in a pick-up truck. Interrogation of a Mr. Ford revealed that he owned a pick-up truck and had on the day in question picked up Appellant near the cornfield and given him a ride to a location close to his father's house.
Thus, the record in this case reveals the investigating officers possessed information in the form of a sequence or chain of occurrences which would indicate to a prudent man, knowledgeable of the information possessed by the investigating officers, that a reasonable ground existed for belief of Appellant's guilt or implication in the alleged crime, and that this basis for belief existed prior to the time the officers entered the room occupied by Appellant and placed him under arrest. See State v. Outten (Fla. 1968), 206 So.2d 392; Diaz v. State (Fla. 1949), 43 So.2d 13; see also, U.S.C.A. Const. Amend. 4.
Although there is conflicting testimony in the record as to whether the investigating officers actually obtained permission from Appellant's stepmother and wife to search the premises, the question of whether sufficient and valid consent to search existed is not germane to the legality of Appellant's arrest and the search incident thereto under the independent showing of probable cause attending the factual circumstances above enumerated. Thus, having concluded Appellant was validly and legally arrested, it follows that the disputed evidence seized in his bedroom and on his person as incident to his arrest, and testimony relating thereto, was admissible into evidence. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.
Appellant contends the trial court erred in denying a motion to suppress a certain pocketbook or billfold, State Exhibit No. 8, and further erred in denying Appellant's motion for mistrial grounded upon the admission into evidence of certain hearsay testimony in connection therewith. We deal first with the contention the trial court erred in denying Appellant's motion to suppress the pocketbook.
After trial commenced but before presentation of the State's case, Appellant was permitted to present out of the presence of the jury certain testimony relevant to the issues raised by various motions to suppress. Regarding the pocketbook, Sheriff Edwards of Gadsden County, Florida, testified that he personally conducted a search for the pocketbook on Tuesday night, August 15, 1967, in the backyard of the premises of Henry Perkins, Appellant's father; that after failing to locate the pocketbook pursuant to this search, he talked to Queen Perkins (Appellant's twelve-year-old sister) and told her where Appellant had stated the pocketbook was located, "about ten feet from the toilet out there." Sheriff Edwards testified that he then instructed Queen to find the pocketbook for him. The witness further stated he returned alone to the Perkins home around noon the next day, questioned Appellant's stepmother as to whether the pocketbook had been located and learned that the children had found it; that Queen Perkins then brought it to him; that he could not remember where the children found the pocketbook; that he examined the pocketbook and found the victim's driver's license and several pictures *387 and identification cards, and, that he did not have an arrest or search warrant either when he searched the premises or when exactly he finally obtained the pocketbook from the children.
On cross-examination, Sheriff Edwards testified Deputy Martin had told him that Appellant had revealed to Deputy Martin the whereabouts of the pocketbook and had given the officers permission to search for it.
Appellant's counsel thereupon elicited testimony from Queen Perkins and Appellant's stepmother in which they denied talking to anyone about locating a pocketbook and denied also that Queen had found a pocketbook and turned it over to Sheriff Edwards. Jean Perkins, Appellant's wife, testified on the motion to suppress to the effect she had no knowledge of any member of the family participating in a search for a pocketbook or that anyone turned over a pocketbook to Sheriff Edwards.
Appellant testified concerning the motion to suppress out of the presence of the jury. He denied making a statement to officers Martin and Edwards that he had hidden the pocketbook in the yard next to the toilet, and denied giving permission to the officers to search his home or yard for the pocketbook.
The thrust of Appellant's argument in support of his motion to suppress all evidence concerning the pocketbook is grounded on the contention it was obtained as a result of an illegal search and seizure. The State's response to this contention is that the search in question was conducted pursuant to Appellant's free and voluntary consent or permission to search the backyard of the Perkins home. The State further contends the area searched was merely the grounds of the Perkins residence and thus was not entitled to protection under the prohibition against unreasonable searches and seizures. Under the facts here presented, we adopt the State's latter proposal as determinative of this issue.
Assuming arguendo Sheriff Edwards by instructing and authorizing Queen Perkins and the other children to search the backyard premises for the pocketbook made said persons agents of the State for the limited purpose of conducting a search of the specified premises, Appellant must nevertheless demonstrate that such vicarious state action intruded that sphere of privacy safeguarded by the constitutional prohibitions against unreasonable searches and seizures. Here, since the children were only requested and instructed to search the backyard premises of Appellant's father's house, Appellant falls short of demonstrating under prevailing authorities that the state action attributable to Queen Perkins and the others constituted an invasion of a constitutionally protected area. See Monnette v. United States (5th Cir.1962), 299 F.2d 847; United States v. Clancy (D.C. Miss. 1968), 285 F. Supp. 98; United States v. Campbell (D.C.So.Car. 1967), 275 F. Supp. 5.
Even if we were persuaded that the grounds surrounding a dwelling are entitled to protection under the prohibition against unreasonable searches and seizures, we have serious reservations whether, under the present circumstances, Appellant demonstrates sufficient standing to challenge a search of the outlying portions of premises owned by his father. However, since we conclude the denial of Appellant's motion to suppress the pocketbook is unquestionably sustainable on the ground above enumerated, we believe it unnecessary at this juncture to fully explore the questionable existence of those factual requisites necessary to vest Appellant with standing to contest the search here involved. See Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
In concluding the trial court acted correctly in denying Appellant's motion to suppress the pocketbook, we comment by way of explanation that we are only concerned with the record evidence so far as it pertains to the underlying question of the legality and constitutionality of the procedures *388 employed by the State relevant to the discovery and impounding of the pocketbook. In resolving this question we see no need to dwell on the conflicting testimony as to whether the pocketbook was delivered into the custody of the State as described in the testimony of Sheriff Edwards. This latter testimony goes to the issue of the establishment of a predicate to support the admissibility of the pocketbook into evidence generally, but does not shed light on the constitutionality of the procedures contested by the motion to suppress.
Having concluded the motion to suppress the pocketbook was properly denied, we must now resolve whether the pocketbook was properly admitted into evidence and also consider the propriety of the trial court's action in denying Appellant's motion for mistrial grounded on the introduction of hearsay testimony in connection therewith.
On direct examination, the prosecutrix testified that a pocketbook had disappeared from her trailer home on the day of the alleged assault. The witness thereupon identified State Exhibit No. 8 as her pocketbook and stated it was the pocketbook that disappeared at the time of the assault. Objection was made to the admission of such pocketbook into evidence and the State withdrew its proffer. Subsequently, during the course of the trial, Sheriff Edwards was called as a witness for the State. He testified regarding his search of the backyard premises of the Perkins residence and related he and Deputy Martin were unsuccessful that night in finding the pocketbook.
The following testimony then occurred:
"Q [By State Attorney] Did you go back to the home the next day?
A Yes, sir.
[Defense Counsel]: When you say the next day, what day was that?
A That was the 16th, I believe.
Q I hand you State Exhibit 8 for identification and ask that you look at that and tell us whether or not you got that pocketbook at the defendant's home the next day.
[Defense Counsel]: Objection, Your Honor, no proper predicate.
THE COURT: Objection overruled.
A Yes, sir.
Q Will you tell us the circumstances surrounding the getting of the pocketbook?
A Well, we didn't find the pocketbook that night and Queen and another little girl said they would find it the next morning.
[Defense Counsel]: Objection to this hearsay and move to strike.
A Anyway, when I went back 
[Defense Counsel]: Objection.
THE COURT: Objection sustained and motion granted. You will disregard the statements the Sheriff made about what Queen or someone else said."
Appellant's counsel out of the presence of the jury thereupon promptly moved for a mistrial based on the interjection of the hearsay testimony. Argument of the issue resulted in denial of Appellant's motion subject to the State connecting up the evidence as it promised to do in argument. Subsequently, through the testimony of Deputy Martin, the State introduced evidence to the effect that Appellant had disclosed the whereabouts of the pocketbook and had given permission for the officers to search for it. Thereupon the State again offered the pocketbook into evidence.
After an objection to the admission of the pocketbook was lodged by Appellant, the jury was removed and the Court questioned the State as to the existence in evidence of a connecting chain pertaining to where the pocketbook came from. Thereupon Sheriff Edwards was recalled to the stand by the State and testified that he obtained *389 possession of the pocketbook from Queen Perkins at the Perkins house when he returned to the house on Wednesday morning, after failing to find the pocketbook when he and officer Martin conducted a search for the same in the backyard premises of the house Tuesday night. Upon renewal of the State's motion to admit the exhibit and over objection by Appellant, the pocketbook was admitted into evidence.
Under the facts detailed above, we conclude the State has adequately demonstrated the existence of a connecting link, or chain, in the manner in which it obtained possession of the pocketbook so as to sustain the relevancy of that exhibit. Under the circumstances involved, it was not imperative for the State to show how Queen and the other children obtained possession of the pocketbook, it being permissible for the State to demonstrate merely that it obtained custody of the exhibit from those persons who had control and free access to premises visited and occupied by Appellant. The inferences suggested by these circumstances are sufficient to meet governing standards of relevancy which condition the admissibility of evidentiary matter.
As to the propriety of the trial court's denial of Appellant's motion for mistrial predicated on violation of the hearsay rule, we do not believe that the hearsay matter disclosed to the jury so harmfully touched on an ultimate fact as to be impossible of being remedied except by declaration of a mistrial. Rather, we conclude that the cautionary instruction given by the trial judge coupled with the relative remoteness of the matter asserted in the hearsay declaration vitiated the potential existence of a miscarriage of justice. The trial judge in the exercise of his discretion was warranted under these circumstances in denying Appellant's motion and proceeding with the trial of this cause. See 32 Fla. Jur., Trial, § 245.
Another contention raised by Appellant concerns the introduction into evidence of testimony pertaining to the out-of-court identifications of Appellant by the prosecutrix. Appellant contends these identifications, consisting of the photographic identification and the subsequent custodial identification, were rendered objectionable because they transpired without the presence of counsel for Appellant. Appellant also challenges his in-court identification by the prosecutrix on the basis it was tainted by the prior out-of-court identifications. Appellant's contentions in this respect are grounded largely, if not exclusively, on application of the United States Supreme Court's pronouncements in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).
The State asserts that Appellant's reliance on the Wade and Gilbert decisions is misplaced for three reasons. First, the State contends that the procedures here employed, i.e, identification or selection from photographs and custodial identification of the accused by viewing him through a window in the jail where he was confined, do not constitute a "lineup" as this term was used to describe the factual situations dealt with in Wade and Gilbert.
Secondly, the State argues that Wade and Gilbert only condemn evidence of courtroom identifications of an accused where there exists evidence suggesting that the courtroom identification was the fruit of a suspect pretrial identification, a factor the State urges is absent in the present case. Finally, the State contends both Wade and Gilbert were intended to encompass only lineup situations conducted after indictment and the appointment of counsel for the accused.
We need not now resolve all the difficulties attending the State's first two contentions. We conclude the following language in Wade is indicative of the intended scope of the Supreme Court's pronouncement in that decision as embracing only post-indictment lineup situations.

*390 "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was `as much entitled to such aid [of counsel] * * * as at the trial itself.' Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, at 60, 77 L.Ed. 158. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an `intelligent waiver.' See Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70. No substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel. Concern is expressed that the requirement will forestall prompt identifications and result in obstruction of confrontations. As for the first, we note that in the two cases in which the right to counsel is today held to apply, counsel had already been appointed and no argument is made in either case that notice to counsel would have prejudicially delayed the confrontations." 388 U.S. at 236, 237, 87 S.Ct. at 1937-1938. (Emphasis supplied.)
By thus interpreting the Wade and Gilbert decisions as embracing only post-indictment lineup situations conducted in the absence of and without notice to an accused's appointed counsel, we do not imply any reservations pertaining to the potential enlargement of the rationale of those decisions so as to encompass factual situations more closely akin to the instant case. Indeed, we are not unmindful that the identification procedures involved in the present case may well bespeak characteristics common to the infirmities held to be objectionable in the Wade and Gilbert decisions. The view adopted herein is merely a preference for deferring consideration of the thorny problems attending the expansion of the Wade and Gilbert rationale to that judicial body possessing the greater experience in resolving problems impacted with such difficulties.
Another ground for reversal urged by Appellant concerns admission into evidence of certain incriminating statements allegedly made by Appellant while incarcerated in jail in Bainbridge, Georgia. All of the evidence pertaining to Appellant's statements were offered into evidence through testimony of the interrogating officers. One of these officers, Deputy Martin, acknowledged that he had destroyed certain notes whereby he had reduced Appellant's admissions and confessions to writing.
At the outset, we dispose of the State's contention that we need not consider the merits of Appellant's motion to suppress testimony pertaining to the alleged statements in the Bainbridge jail, since Appellant's motion to suppress was raised for the first time at trial. While there is some confusion in the record as to the precise time Appellant elected to attempt to exclude from the evidence testimony pertaining to his alleged incriminating statements, the record conclusively demonstrates Appellant's counsel was given permission at the conclusion of the preliminary hearing to produce additional testimony out of the presence of the jury relevant to certain motions to suppress. Under such circumstances, we do not believe a sufficient showing is made that Appellant was so dilatory in raising his objection to warrant application of the view adhered to in Kelly v. State (Fla.App. 1967), 202 So.2d 901.
Considering the merits of Appellant's motion to suppress the testimony of his alleged confessions and admissions, we think there is ample evidence in the record to sustain the view that the incriminating statements allegedly made by the Appellant were freely and voluntarily given and were obtained by the investigating officers only after Appellant was properly advised of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. *391 2d 694 (1966). Where, as in the instant case, there exists conflicting testimony as to whether an accused's constitutional rights were violated in the manner in which incriminating statements were obtained or elicited from him, the trial court is properly charged with the duty of resolving such conflicts, and in so doing must indulge every presumption against waiver of fundamental rights secured by the Constitution. Thus, in accordance with the operation of the presumption against waiver of fundamental rights, the allegations assigned by Appellant in support of his motion suppress the incriminating statements must appear to be negatived by clear and convincing evidence in the record in order for the trial court's denial of the motion to suppress to be properly sustained. In the present case, we believe the record is sufficiently replete with corroborative testimony of the proper administration of the Miranda warnings and of the voluntariness of Appellant's statements so as to fully satisfy the above requirement.
In reaching this conclusion, we are not unmindful of Appellant's own testimony vehemently denying and refuting the State's evidence that the questioned statements were secured in accordance with full recognition of Appellant's constitutional rights. Such testimony, however, standing alone, does not, in the absence of even the slightest independent challenge to the corroborative nature of the State's evidence, cast sufficient doubt on the State's proof to preclude the result here reached.
Relevant to his motion to suppress the questioned statements, we note parenthetically Appellant has not advanced either in his brief or in oral argument the specific contention that, under the facts of this case, the incriminating statements should have been excluded from evidence by virtue of the failure on the part of law enforcement authorities to comply with F.S. Section 901.23, F.S.A., prior to instigating the interrogation sessions acknowledged by the authorities to have transpired while Appellant was confined in jail in Bainbridge, Georgia.
F.S. Section 901.23, F.S.A., requires that persons arrested without a warrant be taken "without unnecessary delay" before a magistrate. We are indeed aware of the similarity of this statute and related procedures described in Fla.Cr.P.R. 1.122, 33 F.S.A., to the requirements of Rule 5, F.R. Crim.P. We are equally aware that cases interpreting the Federal procedures have uniformly recognized the purpose of these procedures as designed to insure that a person who stands accused will be advised of his constitutional rights by a judicial officer, rather than an enforcement officer, before running the gantlet of extensive and protracted interrogation at the hands of law enforcement authorities. Coyote v. United States (10th Cir.1967), 380 F.2d 305, cert. denied 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484; Wheeler v. United States (10th Cir.1967), 382 F.2d 998. We are likewise constrained to note that as a result of the proper execution of the safeguards envisioned by the Federal procedures, the necessity for extensive inquiries of truth as to duress or force claimed to have been exercised by police in obtaining incriminating statements are largely obviated or at least the risk of a mistaken factual determination by the trial court regarding such claims is substantially reduced. See United States v. Bellamy (4th Cir.1964), 326 F.2d 389.
Although this Court has in the past indicated reluctance to apply this State's statutory and rule-oriented procedures with force and effect comparable to that upheld and sanctioned by the Federal judiciary (see divergent views in Dawson v. State, Fla., 139 So.2d 408), the time may have arrived when we should in an appropriate proceeding reexamine these procedures and study their full measured implications and importance to our judicial system. In truth, safeguarding committing magistrate procedures similar to those adhered to in the Federal judiciary may have *392 been of utmost importance to the 17-year-old appellant, unable to read or write according to the record, when he was faced with the prospect of a trial for his life. Therefore, while we conclude that the specific grounds asserted in support of Appellant's motion to suppress the incriminating statements are not sufficient to justify excluding such statements from evidence, nothing in this opinion is intended to preclude Appellant from further challenging the admissibility of these statements in proceedings properly postured to adjudicate the complicated issues and questions alluded to above. Likewise, however, nothing in this opinion is intended to foreshadow conclusions as to the merits of such questions and issues when, and if, they are properly presented for adjudication.
Appellant contends his constitutional right to an impartial jury was violated by the trial court excusing for cause prospective jurors who stated they were opposed to capital punishment or had conscientious scruples against capital punishment. In support of his position, Appellant relies on Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which held that a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. We note at the outset that the voir dire examination in the instant case is controlled by the principles enumerated in Witherspoon, since the Court in that case specifically acknowledged the fully retroactive application of its holding. Witherspoon v. Illinois, n. 22.
However, notwithstanding such retroactive application, for reasons discussed infra, we do not deem the present facts sufficient to demonstrate a violation of the Witherspoon holding.
Appellant asserts, and the record confirms, that immediately prior to the selection of the jury, Appellant challenged the constitutionality of the statute (presumably F.S. § 932.20, F.S.A.) so far as it permits a prospective juror to be excused for cause on the basis said juror may possess conscientious scruples or convictions against imposition of capital punishment.
In Williams v. State, Fla., 228 So.2d 377 (opinion filed April 23, 1969), we had occasion to examine, in light of Witherspoon, F.S. Section 932.20, F.S.A., which provides:
"No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be allowed to serve as a juror on the trial of any capital case."
We concluded in Williams that this statute was compatible and consistent with the Witherspoon rationale since the disqualification imposed in the statute was conditioned on a finding that the opinions or beliefs entertained by the venireman must be such as to preclude him from finding the defendant guilty of an offense punishable by death.
Notwithstanding the constitutionality of the statute vel non, Appellant asserts the trial court improperly excused certain veniremen for cause simply because they voiced objection to capital punishment. Appellant specifically contends prospective juror Alfred Smith was excused after responding as follows to a general question directed by the trial court: "I don't like capital punishment * * * I'm against capital punishment."
Although the record does reflect that venireman Smith was asked by the court to "stand down" after making the preceding statement, the record also reflects that Appellant's counsel's request to further inquire regarding this prospective juror's views against capital punishment was granted. This colloquy appears in the record as follows:
"MR. TONEY [defense counsel]: No cases at all that you could give the verdict of the electric chair to?
JUROR: No, sir.

*393 MR. TONEY: You are just unalterably opposed to the idea?
JUROR: Yes, sir.
MR. TONEY: All right, we agree, Your Honor."
Although the trial judge may have been premature in initially asking the prospective juror to stand down, the plain fact remains that the excusal of venireman Smith in no way offends the principles enunciated in Witherspoon since it eventually became clear this prospective juror's scruples against capital punishment were such as to preclude him from returning a verdict of guilty if it might mean the imposition of the death penalty. See Williams v. State, supra.
Beside the episode concerning venireman Smith, Appellant alleges the State was permitted to excuse over objection several other prospective jurors on the basis of statements made by them to the effect they were opposed to capital punishment. The difficulty with this contention is that the record does not contain a report of the examination of the veniremen in queston. A notation by the court reporter reflects questioning on voir dire had commenced prior to a request to the reporter to report or transcribe the questioning of prospective jurors. It is admitted by Appellant that the alleged improper excusal of veniremen occurred during the unreported examinations. In disposing of Appellant's contention on this point, we readily acknowledge that the impact of Witherspoon makes it extremely critical that the voir dire examination in a death case be preserved in the record for review and inspection at the appellate level. However, we do not believe it is constitutionally offensive to require the reporting of such examinations to be contingent on a request for same. See F.S. Section 43.06, F.S.A. The assistance of effective counsel in most instances will insure the performance of those steps necessary to preserve a reviewable record. So long as no impediment to equal protection inheres in the procedure for recording such examination, and so long as the State takes no affirmative action to deny the ready enjoyment of this right (see Evans v. State, Cr.App.Tex. 1968, 430 S.W.2d 502), we believe the procedure presently applicable in this state, and applied in this case, to be compatible with constitutional standards. Additionally, where as in the present case, constitutional infirmities are alleged to have transpired in unrecorded voir dire examinations, we believe proceedings vel non are available for gleaning those facts critical to a disposition of the issues presented and that an aggrieved defendant should first undertake and exhaust these procedures before asserting an issue which is factually unrecorded on appeal.
We have carefully considered all assignments of error and, as required by F.S. Section 924.32(2), F.S.A., have reviewed the evidence to determine if the interests of justice require a new trial. We have concluded the assignments of error are not well taken and that the evidence supports the verdict and judgment. Accordingly, the judgment is affirmed.
ROBERTS, DREW, ADKINS and BOYD, JJ., concur.
ERVIN, C.J., concurs specially with opinion.
CARLTON, J., concurs and also agrees with first two paragraphs of Chief Justice ERVIN'S specially concurring opinion.
ERVIN, Chief Justice (concurring specially).
Although we have in our foregoing opinion and judgment considered all assignments of error and as required by F.S. Section 924.32(2), F.S.A., have reviewed the evidence to determine if the interests of justice require a new trial, and concluded that the assignments of error are not well taken and that the evidence supports the verdict and judgment, I think it appropriate *394 to note by way of caveat there may exist potential procedural infirmities in the conviction and sentence of Appellant not apparent on the record which conceivably could warrant postconviction remedy.
At least we know that something in our jurisprudence in Florida in the disposition of death sentences in capital cases is out of gear to the extent that neither the state's chief executives nor the United States District Court for the Middle District of Florida have authorized or permitted the carrying out of such sentences in the state for the past several years and that this impasse has resulted in an unresolved and perplexing disposition dilemma for nearly all concerned and particularly for the Florida courts, both trial and appellate, and for state officials who have the custody of prisoners under death sentence.
I submit the following suggestions as possible judicial avenues to resolve the dilemma:
(1) Possibly we should judicially adopt in Florida a two-stage jury determination of guilt and punishment in capital cases.[1]
(2) Possibly a jury's decision to recommend or not to recommend mercy in a capital case should not be held to preclude the trial judge from determining in his sound discretion the punishment to be imposed upon the defendant in a capital case, provided the defendant timely requests an allocutionary hearing and a final determination by the trial judge of the sentence to be imposed. If such a hearing is requested the jury's nonrecommendation of mercy could be deemed as advisory only. The allocutionary hearing could be held by the trial court as a part of the jury's determination concerning a recommendation, or afterwards, in the discretion of the trial judge.
(3) Possibly a death sentence should be reviewable by the Supreme Court and subject to modification by it if it is found to be too harsh or unusual to fit the circumstances or is out of step with modern concepts concerning appropriate punishment in capital cases.
In support of these suggestions I point to the following:
The reasons assigned in my dissent in Craig v. State (1965), 179 So.2d 202, and for further reasons hereinafter noted.
In Craig this Court sustained in a rape case the single verdict phase procedure (see F.S. Sections 794.01 and 919.23, F.S.A.) authorizing juries which determine guilt simultaneously to fix punishment in capital cases. The contention inherently rejected by this Court in Craig was that the requirements of the concept of fair trial and due process did not require application of a separate two-stage jury procedure for determination of the issue of guilt of a defendant and the issue of whether the death sentence would be imposed (i.e., whether in a capital case tried by a jury that body would recommend mercy). Our decision in Craig did not take into consideration the potential infirmity I have in mind which might be demonstrated in a proper postconviction case.
Under our present system of criminal procedure, Rule 1.780, Florida Rules of Criminal Procedure (which is the same as F.S. Section 921.13, F.S.A.), grants to a convicted person an unfettered right to an allocutionary hearing in open court, except in those cases where the court has no discretion as to the penalty to be inflicted. For example, in capital cases tried by a jury, if a verdict of guilty is returned by the jury without a recommendation of mercy, the court under existing law has no discretion as to the penalty to be imposed, since the degree of punishment, either death or life imprisonment, is conditioned on whether the jury recommends mercy. Therefore, since Rule 1.780 is not applicable to punishment procedures in capital cases (but see Davis v. State, Fla. 1960, 123 So.2d 703), and since under our decision *395 in Craig a defendant in a capital case is not entitled by the dictates of a fair trial and due process to a separate allocutionary hearing in regard to the punishment to be prescribed (see F.S. Section 794.01 and 919.23, F.S.A.), we appear to be faced with the question whether the apparent inequity contained in our present punishment procedures is potentially offensive to the requirements of equal protection of the law and in operation productive of cruel and unusual punishment in capital cases. In answering this question, I only go so far as to note that it seems inconsistent with modern notions of criminal procedure to continue to implement and condone a system of meting out punishment which grants to one group of convicted persons a subsequent and self-exercised right to an allocutionary hearing addressed to the sound discretion of the trial judge in reference to mitigation of punishment prior to sentencing, and denies to another group (persons convicted of capital offenses) any resemblance of even a substitutionary right to have a subsequent and separate allocutionary judicial review of all mitigating considerations, evidentiary and otherwise, which are recognized as relevantly attending the punishment phase of our criminal system.
Not only is it possible the suggested procedures would help to case the impasse presently characterizing capital punishment in this state, but also might rectify potential infirmities which have cast ominous shadows on our present capital punishment procedures.
It appears to me the Appellant in this case would be warranted in seeking postconviction remedy in respect to the punishment phase of his judgment of conviction and perhaps in other particulars not clearly concluded by our judgment on the record submitted in this case. If he did so, it appears to me the questions submitted for judicial review would necessitate answers concerning whether our statutes and rules referred to above should yield to constitutional imperatives in the light of modern concepts somewhat along lines of the suggestions hereinabove set forth. Essential due process and equality of treatment guaranteed in Sections 2, 9 and 17 of the Declaration of Rights, Revised Florida Constitution of 1968, may justify removing the rigid restraint on judicial discretion in the punishment phase of capital cases.
CARLTON, J., agrees with first two paragraphs of Chief Justice ERVIN'S specially concurring opinion.
NOTES
[1] See Dr. Karl Menninger's book The Crime of Punishment, pp. 62-71; 139.