246 So.2d 760 (1971)
Albert Bone THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 39525.
Supreme Court of Florida.
April 7, 1971.
Rehearing Denied June 1, 1971.
Raymond A. Goodwill, Jr., Winter Haven, and Robert E. Pyle, Lake Alfred, for appellant.
Robert L. Shevin, Atty. Gen., and Thomas B. Calhoun, Asst. Atty. Gen., for appellee.
CARLTON, Justice:
This is a direct appeal from a verdict and judgment convicting appellant, Albert Bone Thompson, of rape without recommendation of mercy. See Fla. Stat. § 794.01, F.S.A. Jurisdiction for the appeal attached under Section 4(2), Article V, Florida Constitution, F.S.A.
The victim of the rape and a male companion were in her Volkswagen, preparing to leave a secluded section of woods and heavy underbrush near Winter Haven, when they found their narrow dirt road *761 exit blocked by an automobile containing Thompson and two accomplices. One of the accomplices got out and approached menacingly with an axe. The victim's companion, who was driving, turned the car around and drove a short distance to where the road ended in a small clearing. The couple got out and unsuccessfully tried to flee through the underbrush. She fell, and he was soon caught by the man with the axe, who by that time had been joined by Thompson and the other accomplice.
First, the couple were asked for money, and five dollars were taken from the companion. Then, while his accomplices held the companion at a distance, Thompson forced the victim to submit to intercourse. The other two raped her in turn, the assailants exchanging places so that the companion was always held by two men. After this, the couple were brought over to the parked cars. A sleeping bag was taken from the Volkswagen, and while the companion was again held at a distance, Thompson raped the victim a second time. She was then placed on the back seat of her car and raped again by one of the others. In all, she suffered intercourse five times before her assailants pulled the sparkplug wires from the Volkswagen and departed. The couple were warned that their lives would be imperiled if they reported the incident.
The police were notified of the incident when the couple sought medical attention for the victim. A car matching a description of the assailants' car was subsequently seen in the area where the incident occurred. With the police in pursuit, the car was abandoned and the driver was later apprehended. This ultimately led to identification of Thompson and one other man. All three, Thompson, Charles Larry and Johnnie Lee Lewis, were jointly indicted for rape by the Polk County Grand Jury. In the course of their prosecutions, the following events occurred. The trial court originally appointed one attorney to represent all three, but subsequently separate attorneys were appointed for each defendant. As a result of a Motion for Severance by one defendant and a Motion for Continuance by Thompson, the three were separately tried. The defendant first tried (Johnnie Lee Lewis) was found guilty of rape with a recommendation of mercy. After pre-sentence investigation, he was sentenced to serve 30 years in prison. The District Court of Appeal, Second District, affirmed the conviction; see Lewis v. State, 227 So.2d 92 (2nd D.C.A.Fla. 1969). The defendant next to be tried (Charles Larry) was found not guilty. Thompson was last in line; he was found guilty without recommendation of mercy and this direct appeal resulted.
Two issues have been raised by appellant. We find that neither has merit. The first issue concerns the following occurences preceding his trial. In March 1968, Thompson, Johnnie Lee Lewis and Charles Larry were jointly indicted. Thompson and Lewis were represented respectively by Raymond A. Goodwill, Jr. (present counsel for appellant) and Wallace L. Storey. They were arraigned in open court in May 1968; at the same time, the trial court approved the joint request of Mr. Goodwill and Mr. Storey that they be allowed to retain a Mr. Jones as their investigator. Lewis was tried first, and in October 1968 he was convicted with recommendation of mercy.
In January 1969, Mr. Storey was employed by the State Attorney as a regular Assistant; this was two months before appellant's trial commenced. In March 1969, appellant's counsel filed a "Motion to Disqualify State Attorney," asking that the State Attorney and his assistants be disqualified from prosecuting appellant because of the fact of Mr. Storey's employment. In the Motion it was recognized that the State Attorney himself, not Mr. Storey, would be trying the case, but it was suggested that he and any assistant, "may have the benefit of confidential information *762 related to Mr. Storey by Defendant, Johnnie Lee Lewis, pertaining to the facts and circumstances surrounding this case."[1]
At the hearing on the motion held in March 1969, appellant's counsel explained that he was not alleging any actual wrongdoing within the State Attorney's office, but rather, he was concerned that the situation was per se violative of due process. As precedent, reliance was placed upon Young v. State, 177 So.2d 345 (2nd D.C.A. Fla. 1965), and State v. Bryan, 227 So.2d 221 (Fla.App. 1969). The State Attorney stated at the hearing that there had been no communication between Mr. Storey and the State Attorney or his Assistant regarding the prosecutions of appellant and Charles Larry. To this, Mr. Storey added the following oral statement:
"With reference to the State of Florida v. Johnnie Lee Lewis which was tried on October 14th, 1968 before Judge Lane, I was appointed by the Court to represent Johnnie Lee Lewis and I undertook the representation to and including trial at which time he was convicted of the charge with a recommendation of mercy by the jury, all of which occurred prior to January 7th, 1969 when I undertook the position of Assistant State Attorney in the Tenth Judicial Circuit of Florida. Following this there was a further trial of one Charles Larry who was represented by Mr. Philip R. Haddock, attorney of the Tenth Judicial Circuit of Florida, at which time I was counsel for Johnnie Lee Lewis and I so informed the State Attorney prior to my appointment that the other two cases of Albert Bone Thompson and Charles Larry had yet to be tried and that I could not be involved in any way whatsoever in any discussion of the case for the reason that I had represented Johnnie Lee Lewis and had knowledge of matters relating to the remaining two defendants and, as a consequence of this, the State Attorney and myself have made certain that no communications were had with respect to the remaining cases. No files of mine relating to Johnnie Lee Lewis or any connection therewith has been provided to the State Attorney and no substance of the case has been disclosed to Mr. Darty and what I am saying about Mr. Darty would relate also to the Assistant State Attorney, Mr. Joseph MacBeth because no communication has been had with him either. At the time of my appointment, this situation existed and it has been, as a matter of fact, we have probably had less communication than is usual. About the only communication we have had about the matter was that a particular case was about to be tried and I absented myself and did not appear in the Courtroom when Charles Larry was tried and whom I understand was acquitted and it would be my professional opinion that there was nothing connected with my assuming the position of Assistant State Attorney that would relate to the Charles Larry or Albert Bone Thompson prosecution and to my personal knowledge, Mr. Darty has been handling the matters without my consultation or furnishing any files, documents, or evidence or anything connected with the prosecution of these two cases. There is nothing else except that I might add, as a wrapup statement, that I had prior to that time represented one of the defendants in this cause and have taken a posture professionally to be sure that there would be no involvements concerning any of these three cases. I might further add that the appointment of Assistant State Attorney was known to Mr. Haddock who represented Charles Larry and to Mr. Raymond Goodwill who represented the defendant, Albert Bone Thompson."
Since no wrongdoing is alleged by appellant, we have here an abstract proposition: We are to decide whether employment *763 of a co-defendant's counsel by the prosecution per se creates a situation inherently violative of due process. In deciding this question, we recognize that Mr. Storey was privy to information provided to appellant's counsel by the investigator, Mr. Jones.
Young v. State, supra, cited by appellant, has no pertinence here because Young involved an allegation that the Assistant State Attorney had actively participated in the defendant's defense prior to becoming his prosecutor. State v. Bryan, supra, also cited by appellant, is of consequence, but it is not a decision which operates in appellant's favor.
The question presented in Bryan was whether a defendant was denied due process because he was prosecuted by a State Attorney who had defended him four years earlier in an unrelated matter. The District Court of Appeal, Second District, rightly decided that the mere fact of previous representation four years earlier did not violate due process. In announcing its decision, the District Court also said (omitting citations):
"We hasten to add, however, that a public defender owes his clients the same high standard of fidelity imposed by the Canons of Ethics on other members of The Bar. His duties in this respect are twofold. First, he may not act against his client in any case or matter in which he formerly represented him. Second, he may at no time use against a former client any confidential information acquired by virtue of the previous attorney-client relationship.
"Applying these principles here, the State Attorney can only be disqualified if it were shown that as Public Defender he had actually gained confidential information from a prior attorney-client relationship with the defendant, which information would be usable in the new matter to defendant's prejudice."
The twofold prohibition enunciated in Bryan  that a former defender turned prosecutor can neither act directly against his former client in a related matter, nor provide information or assistance for those who would so act  provides a logical answer to the abstract question. The standard for a prosecutor should also be the standard for his staff, and we so hold. Therefore, we find that employment of a former defender on the prosecution staff does not violate due process save where the two prohibitions set out above are violated. Because of the delicate nature of the problem under discussion, we hasten to add that allegations of impropriety by defendants in this situation must be viewed with the most intense scrutiny, and trial court judges will be given wide latitude in the exercise of their discretion in dealing with these allegations. In the instant case, we find that the trial judge properly denied appellant's Motion.
The second issue raised by appellant goes to the constitutionality of Fla. Stat. § 794.01, F.S.A. as applied against him. This statute instructs that rape shall be punishable by death in absence of a mercy recommendation by a majority of the jury. It is urged that the penalty deprives appellant of due process in light of the fact that co-defendant Lewis was given mercy even though he was rougher on the victim and only raped her once. See Lewis v. State, 227 So.2d 92 at 93 (2nd D.C.A.Fla. 1969). It is also urged that the trial court should have interpreted "shall" to mean "may" in these circumstances under the doctrine of Simmons v. State, 160 Fla. 626, 36 So.2d 207 (1948). The Simmons doctrine is incorrect in the context of Fla. Stat. § 794.01, F.S.A. since the statute is self-executing unless mercy is recommended. As to the constitutionality of the statute, see: Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948); State of Florida ex rel. Thomas v. Culver, 253 F.2d 507 (5th Cir.1958); Baker v. State, 225 So.2d 327 (Fla. 1969); Newman v. State, 196 So.2d 897 *764 (Fla. 1967); Craig v. State, 179 So.2d 202 (Fla. 1965); Thomas v. State, 92 So.2d 621 (Fla. 1957).
Having weighed the evidence in accord with Fla. Stat. § 924.32(2), F.S.A., and having considered the testimony, arguments and briefs arising out of this cause, we now hold that the conviction of appellant was justified, supported by the evidence and free from constitutional error. The judgment appealed from is affirmed.
It is so ordered.
ROBERTS, C.J., ADKINS, BOYD and DREW (retired), JJ., concur.
REVELS (retired), Circuit Judge, dissents with opinion.
ERVIN, J., dissents and concurs with REVELS (retired), Circuit Judge.
REVELS, P.B., Circuit Judge, retired (dissenting).
I have read the record, reviewed the law and find it necessary to respectfully dissent from the majority opinion of this court in this case. This record discloses an amazing series of instances where the defendant's constitutional rights to due process of law and a fair and impartial trial were violated, some of which are enumerated herein:
The defendant was awakened from sleep in his home about 1:30 a.m., arrested and placed in the prison cage of the deputy sheriff's car. He was held in this cage at his home until the co-defendant, who lived 2 or 3 houses away, was arrested. Thereafter, defendant and co-defendant were transported from the place of arrest, in or near Winter Haven, Florida, to the county jail in Bartow, Florida, where he was booked into the county jail. A deputy sheriff read the card warning the accused of his rights and immediately thereafter he was ushered into the interrogation room at the county jail. Two law enforcement officers went into the interrogation room and later testified the defendant gave an oral statement. This statement was reduced to writing, but the defendant did not verify or sign it nor was he asked to do so. It seems this is a strange procedure and such practices should have been eliminated, particularly since the Miranda decision.
This defendant was not given time to call an attorney, and had he been given time it probably would have been impossible to obtain an attorney at that hour of the night. This is especially so when one is a Negro and without funds. Defendant was not warned of his rights at the time he was taken into custody, (Pages 82, 83, 113 and 117), which occurred approximately an hour or more prior to the time he was finally given the warning at the county jail in Bartow.
The procedures and techniques in obtaining confessions have changed over the years from the rubber hose and other means of physical brutality to a more refined and psychological approach; where officers could completely overwhelm, dominate and subdue the will power of the poor, the uneducated, the blacks and other minority groups. The record indicates the oral statement was given freely and voluntarily, but the time the statement was obtained, and the circumstances surrounding the situation causes substantial suspicion the defendant's rights were not safeguarded.
The constitutional right is fixed and automatic. An accused is entitled to counsel from the time he is taken in custody until the case is finally determined. Amendment 6, Constitution of the United States provides:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, * *, *765 and to have the assistance of counsel for his defense."
Section 11, Declaration of Rights, Constitution of the State of Florida:
"In all criminal prosecutions, the accused shall have the right to a speedy and public trial, * * *, and shall be heard by himself, or counsel, or both, to demand the nature and cause of the accusation against him, * * *."
The right of counsel, when charged with criminal prosecution, is based upon the language contained in the constitutional provisions, supra. It is an absolute and fundamental right for the accused commencing at the moment of his arrest and remains inviolate until the final disposition of the case.
No intervening warning read by an officer to the accused can relieve or deprive the accused of this fundamental right to counsel from inception of the case. The officers should not interrogate an accused until he has had a reasonable time in which to obtain private counsel, or if the accused does not have sufficient funds for private attorney, it is the responsibility of an officer to present the accused before a committing magistrate, who will determine the insolvency of the accused, and if so adjudged, will assign a public defender or other attorney as defendant's counsel.
Thereafter, if the officer desires to interrogate the accused, upon reasonable and proper notice to the defense attorney, one may do so. This in no way hampers the law enforcement officers and agencies from carrying out a full and complete legal investigation of the case, to determine whether or not there is probable cause to charge the accused.
These constitutional provisions make it very clear and basic that the right to have counsel is paramount and fundamental. Any other interpretation of these provisions on this subject is a watering down of individuals' absolute rights, and makes a mockery of these constitutional privileges, because they require and grant the right to accused to have counsel not just the right to be warned that he can have counsel. The right to counsel and the right to be warned are very different and distinct propositions. The right to be warned is no constitutional substitute for the right of counsel before interrogation can be legally accomplished.
In this particular case, the officers appeared about 1:30 a.m., knocked on the door, arrested accused in his bedroom, took him to jail and obtained a purported oral statement some time after 2:00 a.m.
Unless we apply the constitutional guarantees to every human being on an equal basis then the time may come when the knock on the door, in the wee hours of the night may not be restricted to the poor or to the minorities, but to all members of society. If the rights of every individual are not protected, then the rights of none of the citizens are safeguarded.
The offense charged in the indictment in this case is alleged as having been committed on January 22, 1968, therefore, the Constitution of 1885 is controlling, particularly Section 11 of the Declaration of Rights of said Constitution. I am not unmindful of what Article 1, Section 16 of the 1968 Constitution tried to do to Section 11 of the Declaration of Rights of the 1885 Constitution. Article I, Section 16 of 1968 Constitution had been outlawed, before it saw the light of day, by the United States Constitution and the decisions of the United States Supreme Court.
Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct., 1602, 16 L.Ed.2d 694:
"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our *766 aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." * * * "A mere warning given by the interrogators is not alone sufficient to accomplish that end." * * * "An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. The accused who does not know his rights and therefore does not make a request, may be the person who most needs counsel." * * * "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege."
Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70:
"It is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." * * * "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."
Experience as a trial judge for many years established the fact many confessions were obtained at a time when most people were asleep, and demonstrated incriminating statements were obtained under suspicious circumstances and in violation of the accused's right against self-incrimination. It is the responsibility of law officers to safeguard an accused's rights rather than circumvent them. To admit the oral statements into evidence was error.
Perkins v. State, Fla., 228 So.2d 382:
"Where, as in the instant case, there exists conflicting testimony as to whether an accused's constitutional rights were violated in the matter in which incriminating statements were obtained or elicited from him, the trial court is properly charged with the duty of resolving such conflicts, and in so doing must indulge every presumption against waiver of fundamental rights secured by the Constitution." * * * "We are equally aware that cases interpreting the Federal procedures have uniformly recognized the purpose of these procedures as designed to insure that a person who stands accused will be advised of his constitutional rights by a judicial officer, rather than an enforcement officer, before running the gantlet of extensive and protracted interrogation at the hands of law enforcement authorities."
To automatically discharge all prospective jurors because they have conscientious scruples against capital punishment is the equivalent of stacking the jury in favor of the prosecution and against the defendant. It is just as rational to excuse for cause all prospective jurors who favor capital punishment, all Negroes because the accused is black, or all white women because the victim is a white woman.
The only way to insure a fair and impartial trial by one's peers is to have a complete cross-section of jurors from all parts of the county with diverse beliefs, different attitudes and philosophies. To exclude one group because of a certain philosophy, destroys the common sense, sensitivity and balance of the venire. Many years ago I learned the judge should not *767 interrogate on voir dire except as to age, citizenship, residence, relationship to the prosecution witnesses, prosecuting officers and to the defendant and his counsel. In following this procedure it was found that only a small number of a venire admit to their disqualifications when the questions are put by the attorneys. Therefore, it should be left to the prosecution and defense to develop the attitudes and the depths of feeling and interest of the prospective jurors. For the judge to interrogate jurors as to their philosophy about capital punishment and to dismiss those who are opposed is a clear indication to the remainder of the jurors the court is saying, "You are to return a verdict carrying the death penalty." This is the only logical inference left with remaining jurors. If left to the prosecution and defense counsel to interrogate each individual juror on this point the implication or inference will not be planted in the minds of the remainder. As a matter of fact, when properly interrogated by the attorneys, only a small number actually state a sufficient ground for them to be excused for cause.
In the case of Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776:
"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." * * * "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law."
Phraseology of the question put by the trial judge touching upon their philosophy regarding conscientious scruples was in language that is biased and prejudiced against this defendant and tantamount to telling the balance of the panel of jurors that the death penalty against this defendant was warranted. The statement of the court is as follows: "Does any of you have such a conscientious conviction against the imposition of the death penalty, even though it may be warranted under the law and evidence that you could not return a verdict of guilty against this defendant?"[*] It was specific and pointed at this defendant in the trial judge's language, to-wit: "  even though it may be warranted under the law and evidenced." This is equivalent to telling the jury the defendant is guilty at the beginning of the trial. This is contrary to the language of the Florida law which is as follows:
Section 932.20  "No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with[*] death shall be allowed to serve as a juror of any capital case."
The question as propounded by the trial judge is the same as saying he is guilty, contrary to law, and is prejudicial error. This is a denial of due process of law in the proper selection of a fair and impartial jury.
The record discloses the defendant was outside of the courtroom in the custody of a deputy sheriff when the court was in session, and at a time the jury was being instructed on certain points by the judge. This is simply contrary to the laws of Florida, in particular Section 914.01, "In all prosecutions for a felony the defendant shall be present" * * * (4) "At all proceedings before the Court when the jury is present." This is grounds for a new trial as set forth in Section 920.05, "(a)  that the defendant was not present at any proceedings where his presence is required *768 under the criminal procedure law." This is prejudicial error and the case should be reversed.
The order of January 23, 1970, denying the motion for a new trial clearly shows the trial judge had a firm conviction there was a miscarriage of justice in this case in which he said,
"Quite frankly, the court has been tempted to grant a new trial, but there is no question that this defendant was found guilty by a unanimous vote of the jury based on the competent evidence, although the failure to recommend mercy was not unanimous. Since the court has been unable to find in the record prejudicial error, it cannot in good conscience grant the new trial. Perhaps on appeal, prejudicial error will be found, but the court is persuaded that such a result would not reach the heart of this problem, for if injustice exists under these facts, there is no assurance that a new trial would correct the injustices."
The trial judge said the defendant was found guilty by the unanimous vote of the jury based on competent evidence; although he did not state the defendant was accorded due process of law and a fair and impartial trial based upon competent evidence and there is a substantial difference. If this record disclosed the defendant was accorded due process of law, and received a fair and impartial trial, probably none of us would be laboring over it now, and particularly the trial judge would not have found it necessary to enter an order of eight pages attempting to rationalize the injustices of the case.
The trial judge, by this unusual order, demonstrated beyond doubt that the conscience of the trial court was shocked to a very high degree; otherwise, there would be no occasion for him to be entering an order constituting a recommendation for a commutation from death to life imprisonment. The trial judge's statements clearly indicate there were injustices in the case and a miscarriage of justice had been done; therefore, it was his duty to grant the motion for a new trial and failing to do so is reversible error.
At one of the hearings on the motion for a new trial, the defendant's attorney quoted from the Witherspoon case, supra, which stated that by two studies it found a majority of the citizens were against capital punishment. The trial judge took issue on this point and announced he was taking judicial notice of the Harris Poll on this subject as printed in Time Magazine that a majority of citizens favored capital punishment. When did the courts of this state begin making decisions based upon public opinion polls (Pages 269, 270); could this be the reason this case is so confused and replete with errors throughout the record? The record indicates the three defendants charged with this crime were all equally involved, and one of the co-defendants had been found guilty and sentenced to 30 years in the state prison and the other co-defendant had been found not guilty. It appears the state's witnesses were so confused as to identification and circumstances it was difficult to determine whether they were testifying against this defendant or one of the other co-defendants who had already been tried.
The majority opinion does not say, but I assume all the blunders and errors committed in this cause are placed in the category of harmless errors. It is my opinion that in a capital case there is no such thing as a harmless error. Any mistake, omission or error in the trial of a capital offense is harmful, denies due process, and jeopardizes the right to a fair and impartial trial.
It is my belief and understanding the function and purpose of this appellate court is not to determine the innocence or the guilt of the defendant, but to examine the record and determine if the defendant was accorded due process of law and given a fair and impartial trial by a jury of his countrymen. This record is so incomplete, *769 so confused and burdened with errors to vote for an affirmance would be disregarding my responsibility. I would be in the same trap with the trial judge, to-wit: a shocked conscience and convinced of a miscarriage of justice.
The justice of this cause requires a new trial; therefore, I vote for a reversal, for a remand of this case and a new trial consistent with legal procedures and constitutional guarantees.
NOTES
[1] Ultimately prosecution of appellant was carried out by Mr. MacBeth, an Assistant State Attorney for the Tenth Judicial Circuit.
[*] emphasis added